T.C. Memo. 2000-104

UNITED STATES TAX COURT

LAURO G. AND GAYLE W. GUADERRAMA, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

STEVE H. BENAVIDEZ, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 16255-97, 20939-97.    Filed March 28, 2000.

Towner Leeper, for petitioners in docket No. 16255-97.

Ramon Acosta, for petitioner in docket No. 20939-97.

Rosemary Schell, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  In separate notices of deficiency,
respondent took a protective position and determined deficiencies
in petitioners' Federal income taxes as follows:

| Docket No. | Year | Deficiency |
|------------|------|------------|
| 16255-97 | 1993 | $35,452 |
|          | 1994 | 17,053 |
| 20939-97 | 1992 | [1]12,339 |
|          | 1993 | 1,054 |

[1] This amount is based on a $16,046 adjustment to income under the indirect method (the source and application of funds method).  In the stipulation of facts, however, respondent and petitioner Steve H. Benavidez (Benavidez) agree that Benavidez failed to report taxable income of $8,646, rather than $16,046, for the 1992 taxable year.

These cases have been consolidated for purposes of trial, briefing, and opinion.

After concessions by Benavidez,[1] the issue for our consideration is whether the transaction between petitioners should be treated as a sale-leaseback or a financing arrangement.

FINDINGS OF FACT[2]

Petitioners Lauro and Gayle Guaderrama (the Guaderramas) and Benavidez resided in Las Cruces, New Mexico, at the time their petitions were filed in these consolidated cases.

Prior to 1991, Benavidez owned a restaurant and bar called Steve's Tavern.  Steve's Tavern burned down in 1989.  Steve's Tavern was insured, and Benavidez received the insurance proceeds approximately 6 to 8 months after the fire.  The insurance

---

[1] The parties have stipulated that petitioner Steven H. Benavidez (Benavidez) is not entitled to a deduction for amortization of the cost of his liquor license.

[2] The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

proceeds, however, were not used to construct a new restaurant and bar because by the time the insurance company paid Benavidez the liquor license would have possibly lapsed due to inoperation of the bar.

Benavidez purchased a tract of real property located in Dona Ana County, New Mexico, from Rodolfo Saenz (Saenz) to be the site for a new restaurant and bar. Under the contract dated July 31, 1990, Benavidez was to pay Saenz $35,000 for the land. This payment was structured to require a $10,000 downpayment, with the $25,000 balance payable in equal annual installments of $6,594.94 for a period of 5 years, the first payment being due on July 15, 1991. Saenz deeded the land to Benavidez on July 31, 1990.

After obtaining the land from Saenz in July 1990, Benavidez attempted to obtain financing through banks to build a new restaurant but was turned down by two or three different banks. The banks would not provide financing to Benavidez because they were unwilling to accept the only asset he had--his liquor license--as collateral. Benavidez had purchased his liquor license in 1985 for approximately $45,000. The availability of alcoholic beverages, in general, attracts more business to a restaurant, and a liquor license can cost as much as $100,000 to $200,000 in Dona Ana County, New Mexico.

Consequently, Benavidez entered into negotiations with Lauro Guaderrama (Guaderrama), a farmer in New Mexico during the years

in question, regarding construction of a new restaurant and bar to be named Severo's. Guaderrama had never constructed commercial property before, but he studied the proposed transaction and concluded that it would be a good investment. Guaderrama and Benavidez subsequently entered into several agreements. On July 26, 1991, Benavidez deeded the tract of land in Dona Ana County to the Guaderramas. Guaderrama then lent Benavidez $25,000 to pay off the outstanding amount under the real estate contract between Benavidez and Saenz. On October 9, 1991, Guaderrama entered into a construction agreement with JVG Construction Co. providing for the construction of Severo's. JVG Construction Co. is operated by Guaderrama's nephew, and Guaderrama financed the construction of Severo's with his savings. Benavidez designed the floor plan for Severo's, while a contractor designed the rest of the restaurant.

On December 4, 1991, the Guaderramas leased the land in Dona Ana County to L&G Investments Ltd. (L&G). L&G, a New Mexico corporation wholly owned by the Guaderramas, was incorporated on December 13, 1991, and is structured as an S corporation for Federal income tax purposes. L&G does not have bank accounts and did not file a Form 1120-S, U.S. Income Tax Return for an S Corporation, for the 1993 tax year.

On December 10, 1991, Benavidez sold his liquor license to L&G for $10 and assigned the trade name "Severo's" and its

telephone number to L&G for no consideration.  At the same time, Guaderrama, as president of L&G, executed a lease with Benavidez that provided for monthly rental payments of $3,031.34 by Benavidez.  Although the lease agreement was between Benavidez and L&G, Benavidez' payments were made directly to Guaderrama. Under the lease agreement, Benavidez agreed to make payments for a period of 15 years.  The monthly payments represented an amortization of the construction costs of Severo's, calculated at a 15-percent interest rate.  In a letter from Guaderrama's attorney, Steven Fairfield (Fairfield), to Benavidez, Fairfield referred to the payments as Guaderrama's costs plus an interest component.  After 10 years, Benavidez had the option to purchase Severo's for 125 percent of the remaining balance.  Benavidez intended to exercise the option to purchase Severo's and sought financing from the Small Business Administration (SBA).

The lease agreement was subsequently amended in May and June 1992 to account for additions to Severo's and loans made by Guaderrama to Benavidez for furniture to be used in Severo's. The final lease agreement provided for monthly payments of $3,821.70.  This monthly payment was based on Guaderrama's total construction costs of $272,237.26, which included the $25,000 that Guaderrama lent Benavidez to pay off the note for the land, and again also included an interest component on Guaderrama's expenses at a rate of 15 percent.

Under the lease agreement, all costs, expenses, and obligations relating to Severo's, including taxes, utilities, and insurance, were to be paid by Benavidez. Guaderrama was to be indemnified by Benavidez for any costs or expenses paid by Guaderrama. If Severo's was partially or totally destroyed and had to be repaired or rebuilt, Benavidez was not allowed to abate the rent. Under the lease agreement, Guaderrama was not liable for any damage to persons or property arising from any cause. If there was an accident on the premises, Benavidez, not Guaderrama, would be liable.

The Guaderramas reported the transaction as a lease on their Federal income tax returns for taxable years ending January 31, 1993 and 1994. Benavidez reported the transaction consistent with a financing arrangement on his Federal income tax return for the 1992 and 1993 taxable years.

Respondent took a protective position in his notices of deficiency and with respect to the Guaderramas, treated the transaction as a sale and with respect to Benavidez, treated the transaction as a lease. In the notice of deficiency issued to the Guaderramas, respondent increased capital gain income for the year ended January 31, 1993, and increased interest income for the years ended January 31, 1993 and 1994. In the notice of deficiency issued to Benavidez, respondent disallowed interest expense and depreciation deductions for the 1992 and 1993 taxable

years.  At the time the notices of deficiency were issued,
respondent believed the transaction was a sale of the premises,
liquor license, and equipment by the Guaderramas back to
Benavidez that resulted in capital gains.  After trial, however,
respondent in his brief took the position that Benavidez did not
relinquish ownership of the property and liquor license to the
Guaderramas, and therefore the transaction was not a sale, but
rather a financing arrangement between petitioners.

OPINION

We must decide whether the parties' transaction was in
substance a "sale-leaseback"[3] or a financing arrangement.  The
Guaderramas contend that the transaction was a lease, while both
respondent and Benavidez contend that the transaction was a
financing arrangement.

I.  Standard of Proof

Before we analyze the transaction, we must first determine
whether Benavidez or respondent should be allowed to ignore the

---

[3] The transaction could not be a true sale-leaseback because
petitioner Lauro G. Guaderrama (Guaderrama) constructed a
building on the land that was transferred by Benavidez, and
therefore Severo's was not "sold" to Guaderrama and then
subsequently leased back to Benavidez.  However, when taking into
account the transfer by Benavidez of the land, liquor license,
trade name and telephone number, all of which petitioners Lauro
G. and Gayle W. (the Guaderramas) argue were subsequently
"leased" back to Benavidez, the form of this transaction is
analytically similar to a sale-leaseback.  Thus, it is
appropriate to consider those factors traditionally associated
with sale-leaseback transactions for purposes of determining the
proper characterization of this transaction.

transactional form where, as here, the transaction was labeled a "lease". A party seeking to overcome the form of an agreement must present "strong proof" for the substance to prevail. <u>Ullman v. Commissioner</u>, 264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957); <u>Coleman v. Commissioner</u>, 87 T.C. 178, 202 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987). A party has adduced "strong proof" when he has essentially shown that the terms of the written agreement do not have "some independent basis in fact or some arguable relationship with business reality such that reasonable * * * [people], genuinely concerned with their economic future, might bargain for such an agreement." <u>Schulz v. Commissioner</u>, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960).

The Guaderramas argue that we should instead apply the more restricted view of the Court of Appeals for the Third Circuit in <u>Commissioner v. Danielson</u>, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965).[4] This Court, however, has refused to apply the standard of <u>Danielson</u> except under the holding of <u>Golsen v. Commissioner</u>, 54 T.C. 742, 756-757 (1970),

---

[4] Under the "<u>Danielson</u> rule", a party can challenge the tax consequences of his or her agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. See <u>Commissioner v. Danielson</u>, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965).

affd. 445 F.2d 985 (10th Cir. 1971), in cases appealable to the Court of Appeals for the Third Circuit or other circuits which have adopted <u>Danielson</u>.  Since the Court of Appeals for the Tenth Circuit, to which this case is appealable absent stipulation to the contrary, has not explicitly adopted <u>Danielson</u>, we decline to apply that standard here.[5]

In this case, one, namely petitioner Benavidez, of two competing petitioners and respondent both seek to ignore the transactional form.  We have observed that "the taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has adopted."  <u>Bolger v. Commissioner</u>, 59 T.C. 760, 767 n.4 (1973); <u>Coleman v. Commissioner</u>, <u>supra</u> at 202.  The strong proof doctrine, however, is not applied to the Government's attack on the form of a transaction.  The present case is a consolidated proceeding, and each petitioner is litigating against the Government.  Because the form of the transaction in this case is being attacked by the Government, and because both the "lessor" and "lessee" are parties to this proceeding, the strong proof doctrine is not applicable.  Cf.

---

[5] The Guaderramas cite <u>Munroe v. Commissioner</u>, 961 F.2d 220 (10th Cir. 1992), as standing for the proposition that the Court of Appeals for the Tenth Circuit has adopted <u>Commissioner v. Danielson</u>, <u>supra</u>.  <u>Munroe</u>, however, simply references <u>Danielson</u> in a string citation and does not explicitly adopt the standard enunciated in <u>Danielson</u>.  Further, <u>Munroe</u> is an unpublished order of the Court of Appeals which specifically states that it has no precedential value.  Thus, we do not read <u>Munroe</u> as adopting <u>Danielson</u>.

Freeport Transport Inc. v. Commissioner, 63 T.C. 107 (1974) (Danielson rule did not apply in circumstances in which both parties to the agreement were before the Court and respondent did not object to the presentation of evidence varying the terms of the agreement); Peterson Machine Tool, Inc. v. Commissioner, 79 T.C. 72, 82 (1982) ("in view of the fact that both the buyer and the sellers are parties to this proceeding, there is even less reason to apply the 'strong proof' rule").  Thus, this Court may look to the substance of the transaction in order to determine the correct tax consequences.  See Hamlin's Trust v. Commissioner, 209 F.2d 761, 764 (10th Cir. 1954) ("It is well settled that the incidence of taxation depends upon the substance of a transaction * * * that the Government may look at the realities of a transaction and determine its tax consequences despite the form or fiction with which it was clothed."), affg. 19 T.C. 718 (1953).

II.  Sale-Leaseback or Financing Arrangement

The Guaderramas contend that the documents in this case label the transaction a lease, that they clearly possessed the benefits and burdens of ownership of Severo's, and therefore the transaction should be viewed as a lease.  Benavidez, on the other hand, argues that he possessed the benefits and burdens of ownership of Severo's and that the transaction should therefore be viewed as a financing arrangement.  Respondent also takes the

position that the substance of the transaction is a financing arrangement.

As stated above, the labels used in formal written documents do not necessarily control the tax consequences of a given transaction; this Court may look to the substance of the transaction in order to determine the correct tax consequences. It is well established that the economic substance of a transaction, rather than its form, controls for Federal tax purposes. See Gregory v. Helvering, 293 U.S. 465 (1935); Frank Lyon Co. v. United States, 435 U.S. 561 (1978). Thus, the fact that the documents contain labels that the transaction is a lease does not govern, and this Court must consider the substance of the transaction between petitioners.[6]

Whether a transaction is a sale-leaseback or a financing arrangement for Federal tax purposes depends on all of the facts and circumstances. See Frank Lyon Co. v. United States, supra

---

[6] Nominally, there are three parties to the transaction at issue--the Guaderramas, Benavidez, and L&G. While some corporate formalities with respect to L&G appear to have been satisfied, L&G lacks any real economic involvement in this transaction. It was incorporated after the transaction was completed, had no employees, conducted no business, was formed solely for this transaction and, according to Guaderrama, functioned for the purpose of shielding the Guaderramas from liability for the liquor sales. Furthermore, payments by Benavidez under the "lease" were made directly to the Guaderramas. Despite the lack of corporate formalities, however, it is unnecessary for us to decide whether L&G should be disregarded for Federal tax purposes because it is a pass-through entity and thus, any taxable income from the transaction is attributed to the Guaderramas, the real parties in interest to the transaction.

(the Supreme Court utilized a factual analysis in determining that the transaction was a sale-leaseback). This Court has traditionally treated a sale-leaseback as a sham transaction if the taxpayer was motivated by no business purpose other than tax benefits and if the transaction has no economic substance because no reasonable possibility of a profit exists. See Rice's Toyota World Inc. v. Commissioner, 81 T.C. 184 (1983), affd. in part, revd. in part 752 F.2d 89 (4th Cir. 1985). In deciding whether a transaction should be treated as a sale-leaseback or a financing arrangement for Federal tax purposes, we often consider factors such as: (1) Whether the purchase price of the original sale-leaseback received by the "lessee" is less than the fair market value of the property; (2) who bears the risks and responsibilities of ownership; (3) the terms under which the payments are made; (4) whether the repurchase price is less than the fair market value of the property; (5) who participates in the profits or appreciation in value of the property; and (6) the intent of the parties. See, e.g., Helvering v. F.& R. Lazarus & Co., 308 U.S. 252 (1939); Sun Oil Co. v. Commissioner, 562 F.2d 258 (3d Cir. 1977), revg. T.C. Memo. 1976-40; American Realty Trust v. United States, 498 F.2d 1194 (4th Cir. 1974); Illinois Power Co. v. Commissioner, 87 T.C. 1417 (1986); Hilton v. Commissioner, 74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir.

1982); <u>Belz Inv. Co. v. Commissioner</u>, 72 T.C. 1209 (1979), affd. 661 F.2d 76 (6th Cir. 1981).

In examining whether the transaction between the two petitioners was a sale-leaseback or a financing arrangement, we find the following factors to be particularly persuasive:

<u>Conveyance of the Liquor License</u>

In <u>Helvering v. F.& R. Lazarus & Co.</u>, <u>supra</u>, the Supreme Court found a transaction to be a financing arrangement instead of a sale-leaseback in part because the instrument under which the taxpayer purported to convey legal ownership to the bank was in reality given and accepted as security. Here, the conveyance of the liquor license reflects a financing arrangement rather than a bona fide arm's-length sale. While Benavidez purchased the liquor license for approximately $45,000, the purchase price paid by Guaderrama to Benavidez for the liquor license was only $10. According to Benavidez, liquor licenses in Dona Ana County currently average between $100,000 to $200,000. While we do not necessarily accept Benavidez' testimony as establishing the worth of a New Mexico liquor license, the fact that Guaderrama was willing to hold it as collateral towards an approximately $272,000 debt indicates that $10 is far from its fair market value. Thus, although legal title of the liquor license may have been transferred to Guaderrama, it was not an arm's-length

purchase, but rather simply a transfer of property to be held as collateral in a financing arrangement.

## Risks and Responsibilities

For purposes of determining the tax consequences of the transaction, another factor we consider is who bears the risks and burdens of ownership. Under the arrangement between the two parties, Benavidez is responsible for all taxes, utilities, and insurance and assumed the full burden and cost of keeping the premises in good condition. Benavidez is also responsible for all repairs or any damage to the premises, and Guaderrama is not liable for any damage to persons or property arising from any cause whatsoever. Benavidez agreed to indemnify and hold harmless Guaderrama from any and all claims and liability for damage to persons or property arising from any cause. Moreover, diminution of rental payments even in the event of a casualty or total destruction is not allowed. Thus, inconsistent with customary leases, this "lease" imposes essentially all of such burdens, risks, and responsibilities for the property upon Benavidez.

## The Terms of the Payments

The rental payment in this transaction is based on the construction costs of the restaurant plus 15 percent interest. The inclusion of an interest component is indicative of a financing arrangement. See Judson Mills v. Commissioner, 11 T.C.

25 (1948).  Under the terms of the "lease", payments are to be made over a 15-year period, beginning in May 1992, and consist of monthly payments of $3,821.70.  In determining the monthly payment, the cost of construction, $272,237.26, was amortized over a 15-year period at a 15-percent interest rate.  The rents have no ascertainable connection to the economic value of the property but instead are related to a fixed interest return on the advances or costs of constructing the property.  This is consistent with a financing arrangement, not a lease.

The Option To Purchase

A repurchase provision of a sale-leaseback transaction often serves the same function as a loan when the repurchase price is geared to the unamortized principal advanced by the "lessor".  See Sun Oil Co. v. Commissioner, supra.  In this case, Benavidez has the absolute right to purchase Severo's and the liquor license during the final 60 months of the term of the "lease".  If the option is exercised, the purchase price of Severo's is the remaining balance due from Benavidez to Guaderrama plus an amount equal to 25 percent of the unpaid balance.  Thus, the option to purchase is directly related to the unpaid balance, not to the fair market value of the property.  If Benavidez exercises the option 1 month before the 15-year term ends, he can purchase Severo's for approximately $4,700, nowhere near the fair market

value of the going business concern.  This is indicative of a
financing arrangement, not a lease.

The Potential for Profit or Loss

A significant factor to be used in determining ownership of
property is the extent to which the taxpayer has potential for
profit or loss as a result of holding the property.  See Frank
Lyon Co. v. United States, 435 U.S. at 579; Sun Oil Co. v.
Commissioner, 562 F.2d at 268.

In this case, the transaction severely limits Guaderrama's
ability to participate in any appreciation in the value of the
property.  Because of the repurchase option at less than fair
market value, it is a virtual certainty that Benavidez will
exercise the option and repurchase Severo's.  Thus, any
appreciation in value will be realized by Benavidez, not
Guaderrama.  Furthermore, all rental payments are at a fixed
amount, with no allowance for inflation or increases in property
value.

In addition, the transaction was structured so that profits
and losses resulting from the operation of the premises will
inure to Benavidez.  Benavidez owns the right to operate and use
the restaurant however he sees fit, and any profits or losses
resulting from the operation of the restaurant belong to
Benavidez.  Guaderrama, on the other hand, has a fixed rate of
return.  Regardless of how successful Severo's is, Guaderrama is

entitled to the same amount of rent.  Thus, any appreciation in the property over the term of the lease is likely to accrue to Benavidez, not to Guaderrama, upon exercise of the option. Guaderrama does not appear to be an equity participant with any real profit or loss opportunities, and thus the transaction is inconsistent with a lease.

Intent of the Parties

The record indicates that Benavidez intended for this transaction to be a financing arrangement.  He had sought financing from banks on two or three separate occasions but had been turned down because they would not accept the liquor license as collateral.  Benavidez testified that it was his intent to have Guaderrama finance the construction of the new restaurant and for Benavidez to pay him back over a period of time.

While Guaderrama's intent is less clear, he indicated in his testimony that he viewed the liquor license the same way that Benavidez did--as collateral.  Guaderrama further explained that he had been getting a return of 6 or 7 percent on his savings and was willing to use his savings to build the restaurant for Benavidez if he charged 15 percent interest as opposed to the 6 or 7 percent return he was receiving.  Thus, Guaderrama was willing to finance the construction of Severo's in exchange for a

15-percent return on his investment.[7]  This is consistent with a financing arrangement.

Conclusion

As "lessee", Benavidez bore the burdens, risks, and responsibilities for Severo's, including the obligation to provide Guaderrama with a fixed return under all circumstances and conditions.  This is indicative of ownership, not of a leasehold interest.  Structurally, the "lease" is very similar to a debt financing as it contains a schedule of payments based on a fixed interest rate.  Furthermore, the rents have no connection with the economic value of the property, but instead they are related to a fixed interest return on the costs of construction. As such, the Guaderramas had little potential for economic profit other than the fixed interest income.  Finally, the option to acquire Severo's at the end of the lease is, in essence, a form of equity for Benavidez because the value to Guaderrama is really just the present value of the future payments for 15 years at a specified rate.

Based on all of the factors discussed above, we conclude that the transaction was a financing arrangement, and Benavidez is entitled to deduct allowable depreciation and interest expense

---

[7] We also note that, inconsistent with their belief that the transaction was a lease, the Guaderramas did not claim depreciation on Severo's as they would have been entitled to had they truly owned the premises and simply "leased" them to Benavidez.

in connection with the financing arrangement, and the Guaderramas must include interest income in connection with the financing arrangement.

III.  Allocation of Payments Between Principal and Interest

As an alternative argument, the Guaderramas contend that the obligation owed by Benavidez was speculative and that they are entitled to first recover their costs of the financing arrangement.  The Guaderramas contend that since Benavidez had insufficient assets to pay for the property, since his sole source of funds was dependent on operating the new restaurant successfully, since his liquor operation was shut down for a period of time, and since his option to buy was nonassignable, repayment by Benavidez was risky, and therefore they are entitled to first recover their costs.  We disagree.

The general rule is that "periodic payments are applied first to interest, with any remaining amount being applied to principal, absent any agreement of the parties to the contrary".  Estate of O'Leary v. Commissioner, T.C. Memo. 1986-212, affd. 837 F.2d 1088 (5th Cir. 1988).  If, however, the obligation is speculative, periodic payments may be applied to the principal until costs are recovered.  See Underhill v. Commissioner, 45 T.C. 489, 492 (1966).  In Underhill we held that, in determining whether a particular obligation is "speculative", the ultimate test is whether, at the debt's inception, the creditor cannot be

reasonably certain of recovering the principal and a major portion of the discount.  See id. at 495.  We are not persuaded that the loan in the present transaction was speculative.

The Guaderramas argue that Benavidez had insufficient assets to exercise the option and purchase the property.  Insufficient assets, however, is not the test of a speculative investment for tax purposes.  In Estate of Ratliff v. Commissioner, T.C. Memo. 1995-428, we stated that "mere absence of security is not sufficient to deem a loan speculative."  In any event, we are not convinced that Benavidez was unable to exercise the option to purchase the property.  Indeed, Benavidez was approved for a loan from the SBA in 1996 and was in a financial position where he could have exercised the option.  Guaderrama was apparently aware of this since Guaderrama's attorney sent a letter to a bank expressing interest in selling the property to Benavidez in order to help Benavidez qualify for a loan.  Thus, the evidence in the record suggests that Benavidez could have exercised the option.

The Guaderramas further argue that Benavidez' sole source of funds was dependent on operating the new restaurant successfully, making the likelihood of repayment speculative.  There is no evidence, however, that Severo's would not be successfully operated by Benavidez.  As Guaderrama testified, he himself had studied the transaction and decided that it would be a good investment.  Thus, we find this argument unpersuasive.  We also

find unconvincing the Guaderramas' argument that repayment was risky because Benavidez had his liquor operation shut down for some period of time. It is unclear when Benavidez had his liquor operation shut down. Guaderrama testified that Benavidez' bar operations were shut down for a period of time, but he could not recall when and stated that it was for "maybe a month or two". Such a vague recollection does not indicate to us that Guaderrama was overly concerned with the temporary shutdown. Furthermore, it does not appear that Benavidez failed to make monthly payments during any period of temporary shutdown, and the Guaderramas have not offered any evidence to the contrary.

Finally, we note that the loan to Benavidez was secured by the liquor license. The Guaderramas' possession of such collateral makes it difficult to argue that the loan was risky. We therefore conclude that the obligation owed by Benavidez was not speculative or risky, and the payments received by the Guaderramas from Benavidez under the financing arrangement must be allocated between principal and interest.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>